**ZENO B. BAUCUS**
**Assistant U.S. Attorney**
**U.S. Attorney's Office**
**James F. Battin U.S. Courthouse**
**2601 Second Avenue North, Suite 3200**
**Billings, Montana 59101**
**Phone: (406) 657-6101**
**FAX: (406) 657-6989**
**Email: zeno.baucus@usdoj.gov**

**ATTORNEY FOR PLAINTIFF**
**UNITED STATES OF AMERICA**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**HELENA DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**ABBEY LEE COOK,**<br><br>**Defendant.** | **CR 25-13-H-BMM**<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |

The United States of America, through Assistant United States Attorney Zeno B. Baucus, provides this sentencing memorandum for purpose of aiding the Court in advance of sentencing the defendant, Abbey Lee Cook.

The defendant has pleaded guilty to three counts of wire fraud, in violation of 18 U.S.C. § 1343, and is scheduled to be sentenced on November 24, 2026. The Presentence Report has calculated the defendant's guideline range at 10 to 16

months. Neither party has any objections to the PSR. This memorandum serves to offer the government's sentencing position.

## OFFENSE CONDUCT

Over a period of years, Cook executed a scheme whereby she defrauded multiple victims that retained her services in connection with campaign or issue-oriented compliance. Cook made a series of false statements and omissions to her victims and filed false reports with federal campaign officials. Her conduct warrants a custodial sentence.

As alleged in the Information, Cook's scheme commenced in approximately September 2021 and ran until roughly November 2024. She was hired by candidates for office and issue-oriented advocacy groups to provide campaign compliance services. As part of her duties, Cook was required to file reports with the Montana Commissioner of Political Practices (COPP). Her victims, for purposes of loss amount, included the following:

- Victim No. 1 ran for office in 2024 and retained Cook to assist with campaign compliance. Cook had a written agreement with Victim 1, in which she was paid $2,000 a month for her services and then a separate fee that Cook charged for filing reports with COPP. PSR ¶ 16. However, in October 2024 Victim 1 noticed discrepancies in the campaign account,

to which Cook had access, and noticed funds were missing. Victim 1 contacted Cook for explanation but never received one. PSR ¶ 17. Cook was terminated by Victim 1 and, in attempt to smooth things over with Victim 1, she transferred money from another victim to Victim 1. *Id.* Cook is held responsible for $87,391 loss as it relates to Victim 1. PSR ¶ 20.

- Victim No. 2 is a Montana PAC that Cook volunteered for in 2021. She continued to work for Victim 2 and had signatory authority on their bank account. PSR ¶ 23. Following the 2024 election cycle Victim 2 observed significant outflows from an account controlled by Cook. *Id.* Representatives of Victim 2 contacted individuals that would have received these outflows and learned they had not received funds from Victim 2. PSR ¶ 24. Cook is held responsible for $82,000 relating to Victim 2. PSR ¶ 26.
- Victim No 3 met Cook in May 2023 and eventually retained her once she announced for elected office in February 2024. PSR ¶ 34. As part of their agreement, Cook was contracted to open and maintain a bank account, manage donations, filing required reports with COPP and preparing weekly reports. PSR ¶ 36. After Cook failed to perform her duties she

was terminated in August 2024, Victim 3 observed several withdrawals that were executed by Cook without authorization. PSR ¶ 38. Cook is held responsible for $1,150 relating to Victim 3. PSR ¶ 39.

- Victim No 4 ran for statewide office in 2024 and retained Cook in July 2023. As 2024 turned into 2024, Cook generally did not respond to Victim 4's inquiries with respect to Cook's work and the campaign accounts. In July 2024 Victim 4 gained access to the account and observed inconsistencies, including a transfer from Victim 1's account to his. PSR ¶ 31. He asked Cook for an explanation and she concocted a story in response. *Id*. Based on these and other experiences with Cook, Victim 4 analyzed his campaign account and observed several checks issued by Cook that were not authorized over a period of almost one year. PSR ¶ 32. Cook is held responsible for $13,682 relating to Victim 4. PSR ¶ 33.
- Victim No 5 hired Cook in 2023, paying Cook a flat fee and a percentage based on the amount of money that entered the campaign account. PSR ¶ 40. Cooked failed to file multiple reports with COPP on behalf of Victim 5 and offered Victim 5 excuses when confronted concerning this oversight. After the 2024 election cycle, Victim 5 directed Cook to

transfer money and Cook did not do so. PSR ¶ 45. Ultimately, Victim 5 learned that she was not a signature card holder on the campaign bank account set up by Cook. PSR ¶ 46. Once she obtained access, Victim 5 reviewed the account and noticed multiple debits that were conducted without authorization spanning from approximately June 2023 until November 2024. Cook is held responsible for $53,282 relating to Victim 5. PSR ¶ 48.

- Victim No 6 is an issue-oriented political organization. Cook did work for that entity in 2023 relating to COPP filings. PSR ¶ 11. She failed to do this. PSR ¶ 12. Indeed, in August 2024 Victim 6 discovered a $18,000 transfer to Cook from the group's account that could not be accounted for. *Id*. Victim 6 continued to contact Cook regarding this $18,000 and Cook responded with a series of excuses. Cook repeatedly said she would return the funds but never did. PSR ¶¶ 12-13. Cook is held responsible for $18,000 relating to Victim 6. PSR ¶ 14.

As the scheme perpetuated by Cook unwound, she was interviewed by law enforcement in June 2025. During that interview, with her counsel present, Cook provided excuses but acknowledge moving money between clients without authorization. She also acknowledged taking money in the amount of around

$100,000 that needed to be repaid or refunded to her political clients and owing certain clients money that she obtained from them without authorization. PSR ¶¶ 69-71.

## SENTENCING ARGUMENT

The district court's sentencing duty is to "'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment." *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting 18 U.S.C. § 3553(a)).

Here, pursuant to the plea agreement entered into between the parties, the Unted States recommends a low-end guideline range sentence. It is important that Cook receive a period of incarceration. The United States Sentencing Commission supports this proposition. As it relates to the type of crime for which the defendant is scheduled to be sentenced, concern that "white-collar offenders" received special treatment and "frequently do not receive sentences that reflect the seriousness of their offenses" was among the motivations for the Sentencing Reform Act that gave rise to the Sentencing Guidelines. S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3260. Among its principal architects was Justice Stephen

Breyer, an original member of the Sentencing Commission. He explained that the Guidelines addressed the issue by requiring a "short but definite period of confinement" for all but "the least serious cases of these white-collar offenses (level '6' or less)[.]" Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 22 (1988). Not only did this reflect the severity of the offenses, it resolved "significant disparities" observed in data gathered by the Commission on how white-collar crimes were treated at sentencing relative to equally serious non-white-collar offenses in the pre-Guideline era. *Id.* at 20. Here, a sentence at the low end of the guideline range adequately accounts for the §3553(a) factors and Justice Breyer's pronouncements with respect to the Guideline's treatment of white-collar offenders such as the defendant and is consistent with the plea agreement in this case.

**A. The court should impose a sentence that reflects the seriousness of the defendant's crime and provides just punishment for his offense under 18 U.S.C. § 3553(a).**

A sentence at the low-end of the advisory guideline range would adequately account for the defendant's conduct. For the better part of three years Cook executed a scheme to deprive candidates and causes of money. She ignored inquiries from clients, she transferred money to herself without authorization at will, she utilized one client's funds to cover another client's obligations, and she

filed a litany of false reports in the process. All of this was designed to enrich Cook and it worked. With a loss amount in excess of $280,000, Cook enjoyed the fruits of her fraudulent scheme.

Cook's conduct was serious and it is why circuit courts have typically recognized the severity of white-collar offenses involving significant losses. *See United States v. Eagle*, 592 F.3d 495, 497-98, 504-05 (4th Cir. 2010) (vacating as substantively unreasonable a sentence of four years' probation where the defendant had evaded $600,000 in taxes); *United States v. Crisp*, 454 F.3d 1285, 1291 (11th Cir. 2006) (reversing as substantively unreasonable a sentence of probation and given hours in custody where the defendant defrauded a bank of $500,000).

In addition to the basic nature of fraudulently obtaining property for herself, it is worth noting that Cook's actions also, at least indirectly, implicated the integrity of the political election system. State and federal elections require a set of rules to ensure that candidates and political causes are confident in the system and that the money they raise will be utilized for the campaign and not siphoned off for personal use. Moreover, and likely more importantly, the public and regulatory authorities rely on accurate financial filings in the context of political campaigns in order to discern from where a candidate is raising funds and the expenses that candidate is incurring on behalf of the campaign or issue. All of this is designed to

provide transparency into Montana and the country's political process and give voters as much accurate information as possible in determining whom to vote for and whom to donate money to. When bad actors threaten that system, even through a simple scheme to defraud, it chips away at the trust the public has with elections and, if not properly addressed, can fester and impact society's confidence in the process. A brief period of incarceration is warranted.

Should the Court be tempted to impose probation as a means of allowing Cook to generate income to pay restitution, the United States respectively contends that choosing a sentence with a "single-minded" goal of facilitating restitution is improper and ignores the statutory requirements under 18 U.S.C. § 3553. *United States v. Crisp*, 454 F.3d at 1287, 1290 (11th Cir. 2006). Moreover, such an argument is belied by the financial assets that the defendant currently controls, as reflected in the PSR. *See* PSR ¶123.[1]

[1] Relatedly, Cook's lack of criminal history also should not guarantee a probationary sentence. The Guidelines already account for her lack of criminal history and further credit is unwarranted. Indeed, the fact Cook is a first-time offender is not atypical; so are more than two-thirds of those who stand convicted of economic offenses in federal court. *Length of Imprisonment for Offenders in Each Criminal History Category by Primary Offense Category*, Fiscal Year 2014 (available at http://www.ussc.gov/sites/default/files/pdf/research- and-publications/annual-reports-and-sourcebooks/2014/Table14.pdf). It is not difficult to understand why. Clean backgrounds, something that would have clearly been relevant to Cook's victims, engender the trust upon which those offenses so often rely.

**B. Adequate deterrence to criminal conduct**

Another significant statutory factor the United States urges the Court to consider is the need for deterrence – both individual and general. It is important to note that Cook only came clean when her lies cascaded upon themselves, her victims reported her contact to law enforcement, and then FBI then approached her. In short, Cook did not unilaterally approach law enforcement and inform them as to her crimes. It was only when she was caught did he come clean and, as such, the issue of specific deterrence is relevant. While the defendant may argue that she will be deterred from any future criminal conduct, the Guidelines "already account[] for the likelihood of recidivism through the guidelines' criminal history computation." *United States v. Rouillard*, 474 F.3d 551, 557 (8th Cir. 2007). Thus, any downward variance is unnecessary on these grounds.

Moreover, general deterrence is an important aspect of white-collar sentencings. "Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.' Defendants in white collar crimes often calculate the financial gain and risk of loss, and white-collar crime therefore can be affected and reduced with serious punishment." *United States v. Martin*,

455 F.3d 1227, 1240 (11th Cir. 2006) (quoting in part Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After* Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)); *see also United States v. Hayes*, 62 F.3d 1300, 1308 (11th Cir. 2012) ("general deterrence is an important factor in white-collar cases, where the motivation is greed"). Here, the undersigned urges the Court to consider the statutory factor of deterrence, and specifically general deterrence, when imposing sentence. Potential white-collar criminals would be encouraged, rather than deterred, from making material misrepresentations to victims for the purpose of obtaining money if they believed that the penal costs were lenient or non-existent. Deterrence matters. That is especially the case when a defendant's conduct, at least implicitly, takes aim at the integrity of the financial reporting and funding associated with political campaign. As such, the United States respectfully asks for a sentence at the low end of the recommended guideline range.

DATED this 10th day of November, 2026

SCOTT TWITO
United States Attorney

*<u>/s/ Zeno B. Baucus</u>*
ZENO B. BAUCUS
Assistant United States Attorney

## **CERTIFICATE OF COMPLIANCE**

Pursuant to D. Mont. LR 7.1(d)(2) and CR 12.1(e), the attached United States Response to the Defendant's Sentencing Memorandum is proportionately spaced, has a typeface of 14 points or more, and has a body containing 2,342 words.

*/s/ Zeno B. Baucus*
ZENO B. BAUCUS
Assistant United States Attorney